COCKE & BRADEN ET AL. V. EWELL J. AYER.

No. 6914.   Decided June 30, 1937.
(106 S. W., 2d Series, 1043.)

*Adkins, Pipkin, Madden & Keffer,* of Amarillo, for appellant.

On proposition that Foran, at the time of the accident, was not an employee of Cocke & Braden nor within the scope of his employment, and that the trial court committed error in refusing to give in his charge to the jury the peremptory instruction requested by appellant and therefore its judgment as entered was contrary to law. Traders & Gen. Ins. Co. v. Ratcliff, 54 S. W. (2d) 223; McCoy v. Beach-Wittman Co., 22 S. W. (2d) 714; Bishop v. Farm & Home Saving & Loan Assn., 75 S. W. (2d) 285.

*W. M. Lewright,* of Corpus Christi, *Willis, Studer & Studer,* and *John F. Sturgeon,* of Pampa, for appellee.

It was not error for the trial court to hold that Foran was

within the scope of his employment at the time of the accident, because there was testimony to raise an issue for the jury as to whether Foran was so engaged in a mission for Cocke & Braden, or performing a duty that he owed to them at said time as to warrant the jury in finding that he was so acting within the scope of his authority. Colgate-Palmolive-Peet Co. v. Perkins, 48 S. W. (2d) 1007; Guitar v. Wheeler, 36 S. W. (2d) 325; Galveston, H. & S. A. Ry. Co. v. Currie, 100 Texas 136, 96 S. W. 1073; 10 L. R. A. (N. S.) 367.

MR. JUDGE HICKMAN delivered the opinion of the Commission of Appeals, Section A.

This case was submitted on certified questions from the Honorable Court of Civil Appeals, Seventh District, at Amarillo. Two questions are certified, but the answer which we shall return to the first question renders the second one immaterial. We shall therefore limit the statement of the case to such facts as relate to the question answered.

Appellee Ewell J. Ayer sustained personal injuries by being struck and knocked down on the streets of Pampa by a truck belonging to, and being operated by, Ed Foran. The accident happened after dark while Foran was on his way to a filling station to purchase fuse plugs for the lighting system on his truck. Foran had been hauling gravel and other materials for Cocke & Braden on the day of the accident until early in the afternoon and had come from his work into the City of Pampa to have some repairs made on his truck. After having the repairs made at a garage he was on his way to a filling station for the fuse plugs at the time of the accident. In the trial court Ayer recovered judgment for $19,000 against Foran and Cocke & Braden. Foran did not appeal.

We here quote those portions of the certificate which relate to the question answered in this opinion, as follows:

"On and prior to the 23rd day of September, 1932, C. J. Cocke and W. W. Braden, as partners, were engaged in constructing Highway No. 33 in Gray County under contract with the State Highway Commission. On that date they entered into a contract with one Ed Foran to haul gravel, caliche and other materials used in their improvement work, agreeing to pay him cash for conveying such materials which he might haul from the gravel pit or other point, to the place of distribution on the highway at three cents per load for each quarter of a mile traveled in doing such work. It is further stipulated that Foran should sustain the relation of independent contractor to Cocke & Bra-

den. That Cocke & Braden should have no right of control or direction over any truck or vehicle belonging to Foran nor should they have the right to control the manner, speed or time of driving such truck, nor any right of direction or control over any driver of such truck, except that they should have the right to designate the materials and things to be hauled and the destination to which the same were to be delivered. It is further stipulated that Cocke & Braden should not in any wise be responsible for any injury to the truck or the driver nor liable to any third party for any injury or damage caused to such truck or driver or other person. That the agreement might be terminated by either party immediately upon notice, either verbal or written, to the other party or to party in charge of the operations of such other party.

\* \* \*

"The first contention of appellants to be considered is that they are not responsible for the injuries sustained and the damages suffered by appellee Ayer for the reason that Foran was an independent contractor at the time of the accident and they insist that the court should have directed a verdict in their favor upon this theory.

"Upon this issue Foran testified, in substance, as follows: that after he signed the contract he went to work with a side-dump wooden body on his Chevrolet truck and after working one or two months changed it from a side-dump to an end-dump body under the directions of Spencer, the appellants' superintendent. That he had no understanding with his employers about taking care of the truck while out at work about fourteen miles from Pampa, there being no places out there where laborers could store their trucks. That he was informed by Shipley, appellants' timekeeper, that the contract he signed was the form that all truck drivers signed. That there were about twenty truckers at that time and they later increased to ninety-four. At night they all took their trucks home with them, or wherever they might desire. That his timekeeper allowed him to go to work at 4:00 o'clock A. M., at which hour the steam shovel would start. The shovel was used in the caliche pit in loading the truck. That it was understood the more hours the truckers put in, the more loads they could haul and the more money they received. That the superintendent said the last load they could dump on the road would be before 6:00 o'clock. That he had already been at work when he signed the contract. That he found out where to go to work in the pit from a helper at the shovel. That Mr. Spencer in charge of the pit said it was to their benefit to work from 4:00 o'clock A. M. to 6:00 o'clock P. M., to get in more

loads. That he learned where to place his truck to get his load from the helper on the shovel. That prior to signing the contract he had bought the truck under the superintendent's direction as to the side type of body and how it should be constructed as a side-dump truck. That he bought his gas from appellants and the price was deducted from his pay check every two weeks. He was paid three cents per load for each quarter of a mile he hauled material from the pit to the point of destination where they were spreading it on the road. The longer haul he had, the more money he got for his work. That at the end of the haul the state highway man gave him a ticket showing the number of quarter miles he had driven. From time to time they changed from one pit to another, and he learned the new course by following other truck drivers. That he first located the pit by following a road which had been built by the appellants. That one of appellants' men loaded his truck in the pit with a steam shovel and told him where to stop and how much load to take. That he, himself, had nothing to say about how much load he should take. After he got his load a helper at the shovel told him to drive to the rock crusher over a path that he guessed appellants had built. When he reached the crusher one of appellants' employees operating that machine directed him to drive on to the crusher screen and appellants' employees then unlatched the doors and dumped the load into the screen. That from the time he started from the pit to the crusher and including the time he was in the pit they filled his truck. He then drove out of the pit to the crusher and on to the screen and never got out of his truck or had anything to do with loading or unloading. That after appellants had unloaded his truck, the man at the shovel told him to follow the road to the crusher hopper. When he reached the hopper they directed him where to stop. Then the man at the hopper would tell him to drive under the hopper and a load was dumped into his truck. That when he was under the hopper appellants' employee would fill the front of the bed of his truck first, then have him drive up and fill the balance of it. That he had nothing to do with the matter as to what part of the bed was filled first, but acted under the directions of appellants' employees in driving back and forth for the filling. That he had nothing to say concerning the manner and form of loading the truck nor how much he was to haul. That after he got his load another employee directed him to go from the hopper to the spreading bench where another employee spread the load and levelled it down with a shovel and told him to go on. During all of this time he did not get out of his truck and after the load was spread he went on to the road where it was

distributed. That he found the distributing point on the road by watching other trucks unload. That the first morning he went to work the State Highway Superintendent, with two assistants, directed him as to where he should stop his truck and dump the load and from that time on two of appellants' employees showed him where to dump loads and he had nothing to say about it, but followed the directions of appellants' men throughout the day. He then followed the other trucks back to the pit. That the last delivery truck or load in the afternoon carried a red flag and this was a signal for quitting work. That he worked from 4:30 A. M. until the red flag was put out, unless his truck broke down. That he knew in a way what the term 'independent contractor' meant, but had nothing to do with putting it into the written contract, and it meant nothing more to him at the time he signed than just going to work or getting a job to make some money. That the pit where he worked was always off from the highway, and it was changed three or more times while he worked. That the direction he traveled through pastures to the pit was fixed by appellants running a grader over the route and he followed the road they had prepared. That the roads and directions were changed by appellants and changes were made approximately every mile for all of the truck drivers. That he followed appellants' man who made the change every mile. That about two months after he commenced work at the direction of Spencer, the superintendent, he changed the truck body from a side-dump to a rear-end-dump, and had a latch spring made of a car spring and afterwards put on what was called a 'stiff leg' at the direction of some men on the 'front of the road' whom he understood were appellants' employees. That he did this for the protection of said men and to prevent the bed from falling back on them. That it was not specified how much caliche he should move per day but appellants' servants directed where he should move it from and to what place. That appellants stopped work when the weather was bad and the work was controlled by appellants at all times as to weather conditions and when they stopped he had to stop. That he could not work at night nor at any time when the employees of appellants were not there to load and unload the caliche. That he had to haul the kind of material they demanded and had to have the kind of a body on his truck which they directed, and changed it whenever they told him to, and that was a rule as to all other truckers. That they told him how to get the caliche and he obeyed orders. That he got his load at the pit, went to the crusher, then to the hopper, then to the screening bench and next to the delivery point on the road where two of appellants'

employees did the unloading. That after he had unloaded he would pull off to the side in the borrow-ditch, latch the doors of his truck and go back to the pit. That he had nothing to do with spreading the gravel or caliche. That he had to have 2 1/2 cubic yards on his truck at a load in order to get his ticket. Foran testified that his loads were inspected before leaving the pit and by the State Highway Engineer before the truck was unloaded at the place of delivery on the road.

"Braden testified that the truckers would only do hauling when the plant was in operation. That after they signed the contract, they could haul if they wanted to and if they did not want to haul they would not come. That truckers could quit any time they wanted to. That their trucks were loaded and unloaded by the firm's employees. That the route over which the truckers traveled was not controlled by Cocke & Braden, as the trucks could choose two or three different roads going to the pit. That the Resident Engineer of the State Highway Department determined the number of quarters of a mile it was from the pit to the point of delivery and that Cocke & Braden accepted his estimate for the purpose of paying the truckers. That 2 1/2 cubic yards was the unit that the State Highway Department used, and required his firm to use in hauling material throughout the construction of State Highway No. 33. That the State Highway Department's inspector inspected every load that was delivered. That his firm did the excavation at the caliche pit and built roads to it. That they required the same contract of all the man who wanted to haul. That if a man signed a contract he could hire whoever he pleased to drive the truck. That if a man did not want to sign one of the contracts, no other method was pursued, as it was optional if he wanted to work. That in having men at the pit and crusher and on the highway to assist the truckers, more loads could be hauled per day and the trucker was charged nothing for that service. That the only employees on which he carried workmen's compensation were his own time workers. That he warned his own paid employees to be careful in matters of general safety, but never at any time warned any of the truckers. That Foran in hauling and delivering caliche was only controlled at the point of origin and destination and as to transportation which he was under contract to perform they had no control or right of control over that and did not exercise any. That every time he left the spreading bench until he unloaded the caliche and at other times he was, as to his work, free and independent. That he did not have to work for them unless he wanted to. That if he wanted to quit work at 10:00 o'clock in the morning and go fishing, he

could do so. That he could take any route he wanted to take. That at no place between the crushing plant and the dumping point on the road was Foran controlled by his firm, and they had no control over his manner of driving or operating except at the point of destination.

\* \* \*

"The facts as hereinabove set out are uncontroverted.

"In view of the recent holding of your Honors in the case of Southern Surety Company of New York v. Scheel et al., 78 S. W. (2d) 173, citing Union Insurance Company v. McLeod, 36 S. W. (2d) 449, and cases therein cited, we are unable to agree upon two material issues which we herewith certify to your Honors as follows:

"1. Under the facts as hereinabove detailed, was Foran, as a matter of law, an independent contractor?

"2. Under said facts, was Foran, at the time of the accident, acting within the scope of his employers' business?"

° Since the certificate was filed opinions have been released by this Court in the cases of Dave Lehr, Inc., v. Brown, 127 Texas 236, 91 S. W. (2d) 693; Smith Bros. v. O'Bryan, 127 Texas 439, 94 S. W. (2d) 145, and Riggs v. Haden, 127 Texas 314, 94 S. W. (2d) 152. Of course, the facts detailed in the certificate are not identical with those in any one of the three cited cases, but the essential and controlling facts therein recited appear in one or more of the cited cases. There may be some isolated facts and circumstances set forth in the certificate which, standing alone, would indicate that Foran was under such control of Cocke & Braden as to make him an employee, but the case must be viewed as a whole, and, when so viewed, it presents essentially the same relationship between the parties as existed in the other cases. The question was given careful consideration in each of the three cited cases, and the opinions prepared by Judge GERMAN clearly announce the controlling principles. It is not thought that a further discussion thereof would add anything to what has been written therein. Upon the authority of those decisions the first question certified is answered in the affirmative. This answer renders it unnecessary to consider the second question.

Opinion adopted by the Supreme Court June 30, 1937.